Second case of the day, which is United States v. Rivera, 24-14147. Mr. Kent here for the appellant, Mr. Chang here for the appellee. Mr. Kent, no hurry, but whenever you're ready. May it please the Court, my name is William Kent. I'm here on behalf of Gray Edward Rivera. This appeal presents two issues. First, whether the District Court abused its discretion when it denied a misdraw after the government's Rule 404B witness unexpectedly accused Mr. Rivera in front of the jury of forcing her to perform oral sex, an allegation never disclosed in the government's 404B-414 notice, and one the government itself told the Court had not been disclosed yet before the testimony appeared in trial. Can I start there? Yes, sir. Okay. Let's assume this hypothetical. I know this did not happen, but I'm asking you to assume this hypothetical. The government files a 404B-414 notice, which states that in a prior incident where the stepdaughter of your client, your client went into her bedroom in his boxer shorts, took down his boxer shorts, took his genitals, and put it in her mouth, and she performed oral sex on him. Yes, sir. And they asked the government, I'm sorry, the government asked the Court to allow that in as 404B and 414 evidence. Would that have been allowed under 404B and 414? Well, we don't know because if there had been prior notice as required by the rule, Rule 414 requires 15 days prior notice. I'm setting a hypothetical world where all of that happened. You're going to get to that. So now we have the hearing, and you argue, no, Judge, they shouldn't come in because it's super prejudicial. They argue, Judge, it's very probative. And the judge says, I've looked at this, and I believe it's coming in under both, and gives similar reasons to what happened here. And we get to trial, and a jury instruction is given, similar to the jury instructions that are given for 414 and 404B. Judge Locke, that assumes that if we had had the 15 days prior notice, that we wouldn't have sent a private investigator down to Puerto Rico to determine what were the allegations the child, in fact, had made at the time. Is this what that child said then or not? We would have very likely obtained witnesses to be able to testify in court. This is not reliable. This is not what the girl said when this happened 10 years earlier. And so then the court, so we can't assume that this would have come in. I'm asking you to assume it came in under the facts that I've just stated. It came in. Yes, sir. The judge gave the instruction. We're now here on appeal. Would that have been an abuse of discretion to allow that in? No, sir. Okay. No, sir. If that is the case, I happen to agree with you. I think that's the right answer, and I agree with you on that. Now my question is this case, because the argument you make to us is there had to be a mistrial here because there is no jury instruction under the sun. This is what you told the district court that could possibly have unrung the bell of her stating that your client forced her to give oral sex to him as opposed to just putting his genitalia on her face. And what I want to, I'm having trouble understanding that argument because it seems to me that if this had come in correctly, a jury instruction could have ameliorated any problem in the same way it would ameliorate any 404B evidence, which is telling the jury, use it for this relevant portion, don't use it for another relevant portion. Why would that not, that same instruction, which was in fact given here, in addition to the instruction of don't disregard that last portion of the testimony, which you asked for, is that not sufficient? Well Judge, the trouble I have with your hypothetical is that it assumes facts that we don't know would have applied to this case. I know, but I guess the point is, the argument you're making is this was such a salacious allegation that nothing could possibly have unrung the bell. But it seems to me that if this had come in under the normal process, the bell could have been unrung in any number of ways through instructions. And so, as long as what our mistrial law seems to say, and this is where I'm getting, our mistrial law seems to say that as long as a jury instruction can cure some of these things, there's no necessity for granting a mistrial. Another problem with that hypothetical though, Judge Luck, is this though wasn't admissible because there wasn't the required prior notice. Because it's not admissible, then we get in the category of the jury has heard something they should not have heard. If the jury had been properly, if the evidence had been properly admitted, then yes, I'd agree the instruction would have been sufficient. But if it's enough, if it was properly admitted, and it'd be fine to tell the jury, you're only to use this for the proper purpose, and that would be fine, that's not a mistrial. Then why here, when it's telling the jury, you're to use this evidence for only a proper purpose and not for an improper one, and it doesn't mean he committed the act here, and you have to find that independently, is that not a sufficient instruction to ameliorate the problem, plus disregard what she just said? No, it's not, because the jury, because this gets to the point, can the jury, do we believe the jury is going to disregard that? Because the jury has now heard something which we all agree the jury should not have heard. It was not properly admitted. We agree that. This is not a hypothetical. This is a trial. We know that this evidence came from the jury that should not have come from the jury. We know this was not admissible. I know, but counsel, when we're talking about prejudice, in other words, the failure that no instruction could possibly unring the bell, and this is your terminology, we're talking about a case where your client is accused and there was significant evidence of him recording one, I don't know if it's a stepchild, but one, the child of the woman he was with in a very, in a state for which they should not have been recording her, and using that and viewing those things, and would have been accused properly, because we all agree it was properly admitted, to have abused another stepdaughter sexually under very difficult circumstances. All we're talking about here is one, a little addition to that second thing. Well, judge, excuse me, accusation of rape, forcible sexual battery, is not a little difference between exposing yourself. And I'm not sure that, well, counsel. Counsel, we're all going to treat this as it should be treated, but let's be clear. This wasn't just exposing himself to a stepdaughter. The accusations are that he took his genitalia and hit her in the face with it. That is not just exposing yourself to somebody, nor is it just exposing yourself when you record your second stepdaughter undressing and dressing for multiple times over the course of months. That is serious allegations. And I guess the question I have is, if you add in just one more serious allegation, how is that not ameliorated by an instruction three or four separate times to not consider this for guilt and disregard it? Well, there are two parts to that in response. The first is, you're sort of touching on harmless here. And I don't see this. No, I'm just saying, if we're talking about prejudice, there was a ton of prejudicial evidence here. We're talking about slightly more prejudicial evidence versus a lot of prejudicial evidence that was already admitted. Again, with respect, Judge Luck, there is a huge difference between exposure. And because a crime of sex battery requires, both federally and state, it requires the touching of the genitals by the perpetrator's genital has touched the mouth or the anus or the vagina of the female. And simply touching the face with the penis is not a sex battery. It just isn't. I agree with you. But in the world of prejudice in front of a jury, it isn't all that much more prejudicial to what the jury had already heard your client was doing and had done. Well, it's, I guess, in the eye of the observer or eye of the beholder. But Judge, I think there is a big difference between forcing a child, this is a 13-year-old child, because this woman, she's now an adult, 10 years later, she's saying she was forced to perform oral sex. A child, 13-year-old child, being forced to fillet an adult man, that's totally different from an exposure to the jury. Let's get to that, counsel. I think that there's a prior argument before harmless error, and I'd like you to address it squarely. Yes, sir. Why isn't this virtually invited error by your side in this sense? You did not ask for a hearing when the 414-404 notice was given, correct? Her order states that neither side asked for a hearing on this witness before she ruled. It is very possible, and let me also state, you also would concede that the government here acted in the finest traditions of the Justice Department in the sense that the 404-414 notice did not hide the ball, it was not vague, and when it came up, the prosecutor admitted in open court that it's the first time he'd ever heard it. That's all true, right? Yes, sir. So given that, 404 and 414 are notice requirements under the rules. It is very possible, very possible, I don't know, but it's very possible that that detailed notice to your side, he's thrilled, he's thrilled because the only thing she's going to do is take the stand and say those things, and then, because she's a live human being, she says one extra sentence, he obligated me to perform oral sex, unquote, and then it stops. At that moment, there's a strategic decision there by your side, right? Because you could have let it go, you could have let her say the entire thing, and then the cross would have been devastating. The cross would have been, you never said that to the government, right? And then you get the government to stand up and say, we stipulate that she never said it to us. You went the other way. You went with a curative instruction that you requested. So it seems to me that the real problem with this is that it's virtually invited error, isn't it? No, sir. No, sir. Not at all. First, we don't have a right to a hearing, an evidentiary hearing on a 404-B notice. You never asked for one. We didn't have a right to one. And I'd say this to it, that would be deciding this case on facts that are not in the record. We can assume all kind of hypothetical facts. So what I'm asking you, sir, and I should do better, on a 404-14 notice that is in the record in this case, this is an extremely detailed 404-14 notice. Which has not one word about forced sexual abuse. That's right. But you're on notice that she's coming to the stand, and you don't ask for a hearing. At that point, don't you kind of run the risk? Well, Judge, you're spinning my argument against me because in my brief, as you remember, I sort of said if we had had an evidentiary hearing, this problem would have been solved because this wouldn't have happened. And that's what I'm asking you. Let me throw a hypothetical. Counsel, what I'm asking you is you didn't ask for a hearing. Let me suggest this to you, Judge. What if, because you're assuming my client's guilty. You're assuming my client's guilty. No, sir. No, sir. With respect, I'm not assuming that at all. What I'm assuming is, is that under 414, I completely agree with Judge Luck that this comes into evidence. This comes into evidence all day long under 414, and they said it in their notice. And then what are we supposed to do with live human beings subject to cross that one sentence comes out in court, and Her Honor gave your curative instruction? Judge, let's assume this hypothetical. Let's assume my client did not sexually batter this girl. Let's assume that maybe my client was innocent of that accusation. So let's assume when he gets the 414 notice, he says, that's it, that's, yes, she says that happened. I don't want to fight that. That's all that happened. Then if that's all that happened, we don't need the evidentiary hearing. We're going to concede that. We've got to eat it. We've got to accept that in trial. But he doesn't anticipate there's going to be a false accusation of forced sexual battering. That's my hypothetical. And if my hypothetical were the facts, then I win, don't I? No, I think the problem with the hypothetical is that your hypothetical assumes that a single stray comment that is outside of the proffer of the government in a detailed 404, 414 letter is a mistrial. That's the logic of your argument that I'm trying, because I agree with you, counsel. I'm prepared to accept that the single statement is different, is different, but I'm not sure that our law on curative instructions is so frail as to allow you to not try to cure it. Well, this gets, and I try to suggest that Judge Luck's hypothetical is also, it raises the question of harmless error, because the prejudice, we've got to weigh this all together. What are the facts of the case? So how important was this? The government themselves in the brief, I think, argue this is very important evidence, and that's what your suggestion is too, that this is really devastating evidence, the 404 that came in that was properly admitted was devastating, but it isn't, you have to weigh then, is it harmless error? And what did the government have on its case? The three images, the three clips, the document. I understand, counsel, and I've made you stay too long with Judge Newsom's indulgence. I would just like to ask very quickly on the second issue, you agree that a straightforward application of Holmes dooms your argument, right? No, sir, I do not. Holmes is clearly distinguishable. You don't think that, you think that I can actually, I am not bound by Holmes in this case, that I can move around Holmes in this case? I assume that you put that in there because my colleagues would decide, if they want to rehear en banc this case to get rid of Holmes, that's a different story, but for me, on this panel, a straightforward application of Holmes dooms this argument, right? No, sir, I don't think so. I think the panel is bound by Holmes, although I think if, I don't see how Holmes exists in a world with Williams. I mean, the U.S. Supreme Court's Williams, because Williams, which reversed the 11th Circuit's, you know, overbroad, unconstitutional interpretation of the pandering statute, Williams says you do not look at this, and they're defining sexual explicit conduct in Williams, you don't look at the intent or the subjective intent of the viewer. It has to be the conduct, the film conduct, has to be what's sexually explicit. But Holmes postdates Williams by eight years, right? Yes, sir, it does. And as you know, I'm sure we have a rule in our prior panel precedent, so to speak, that there is no overlooked decision exception, right? So Holmes is what it is. So you can try to distinguish it in, like, two minutes. Yes, sir, two minutes, and this is at page 15, bottom page 15, top of 16 on Holmes. They say the placement, this is the facts, I would distinguish it on the facts. Placement of the cameras in the bathroom, this is in the bedroom, and they say the bathroom where the daughter was most likely to be videoed while nude, that's correct, not the bedroom. Videoing and capturing images of her pubic area, and it goes on to say the angle of the camera is the editing of the images at issue. That is Holmes. In our case, and I would like to make a little exception to some of the government's characterizations of these clips here, I myself, to be sure of what we were saying, went to the government agent's Homeland Security's office, I personally looked at these images, only took a minute. There was no editing, there is no focusing on the pubic area. I'd invite the court, too, because I asked the Homeland Security people, has the court or a clerk from the court gone and looked at these images, and I was told not, I'd invite the court to look at those exhibits. If you look at those exhibits, you'll see that what we say in our brief is correct. There was no editing, there was no focusing on the pubic area, there was nothing. This truly is pure nudity while the child is changing clothes, nothing else. That distinguishes it from Holmes. Okay, very well. Thank you, counsel. All right, let's hear from the governor. Good morning, may it please the court, Emily Chang for the United States. Let me start with the Holmes. Holmes does dispose of this case, and this case is analogous to Holmes, so I also went to look at the images, and number one, I also invite the court to go look at them. All three images, I didn't point this out in my brief, but I noticed it on revisiting the images the second time. For counts one and three, the camera moves. If you look at the door, the door will move in the string of images, which shows that someone is manipulating the camera. You state that in your brief. You do state that in your brief. I say that as to count two, but not to counts one and three. I just want to be clear. Your position is that you could tell from both the video and the frames, the still frames that are put together, that there is movement in the camera on the positioning from one frame to the other frame.  There is... It isn't just natural human movement? No. So, these cameras were positioned on a vanity. They're remotely controlled. I understand the facts of the case. Okay. I'm sorry. So, they... It appears to move horizontally. Right. So, I just want to be clear. You can tell. Yes. Not just human movement from, like, I'm here in this part of my room, and now I'm in this part of my room. Oh, right. No, no. That's what I mean by human movement, because if you have a still camera where I move to the left or right, it's going to show something different in each of those things. Are we not talking about that, or are we talking about the camera itself moving because the human being is in the same position? Am I not being clear? I'm sorry. So, you can tell by the relative positioning of the view of the camera that the camera is being moved. It's not just the person moving. And you can tell that because things like the door that cannot move are in a different position in the frame. Does that matter? Yes, it matters, because... Let's assume that wasn't the case. Would you still win under Holmes? Yes. We would still win. Tell me why. Okay. We would still win under Holmes because of the extensive focus on the pubic area, this focus on the shoulders to the knees, largely, or nose to the knees. Sometimes it's a narrower scope of viewing. But the head is cut off, the face is cut off. This child is being viewed as a sexual object, similar to Holmes. It's being... Also, the cameras are set up in three different parts of the vanity. It's not a very large room. It's meant to cover the entire scope of the room. And this is where the child got changed every day. She got changed... Where are the cameras focused, too? So, yes, it's three set up on the vanity facing outwards. But towards something, what is it towards? So it's towards the only open space in the room. And the cameras are in front of a mirror, which is where you would change in front of as... Well, the question I have is, isn't it in front of... It's a bureau... I don't know if you call it a bureau, or like... Dresser, yeah. Dresser or drawers? Yes. That's where clothes are kept, right? Correct. In other words, if one is leaving their bathroom in a towel, and one is going to change, where would you focus your cameras on? You wouldn't focus it on the door coming in and out. You wouldn't focus it on the closet in the back there. You would focus it on the bureau or the drawers, right? Well, that's correct. And she kept her underwear and bra actually behind. So it's between where the clothes were kept. There are two places where the clothes were kept. Yes. And also, there's extensive focusing on the video and capture of the pubic area. And I would also note that only 14 videos were ever found of... Like produced from these spy cameras. All of them show her undressing. Well, I guess that's the next question. In other words, when Holmes talks about the editing, what they're talking about is cutting out stuff that someone who wasn't interested in, or someone who had no purian interest would care about, and only things that someone with purian interest would care about, right? Right. In other words, there isn't pictures of her doing homework. There isn't pictures of her sleeping. Exactly. Exactly. And that's why I point out that we only charge three images as attempted or as actual production, but only 14 were ever caught, were ever found, and the three were already deleted. And they only ever show her undressing. So that shows what the focus is on. The producer's focused, which is what matters in Holmes, the producer's intent. And that is evinced by what is actually captured. Even outside the camera angles, and the focus, and where it's set up, and what was clipped, even outside of those things that Holmes looked at, is there some other evidence in this record to suggest purian interest? Yes. There's what he did with the images. For example, the day that he got KeepSafe, which is this photo encrypted vault, is the same day that he produced Count One. And his other behavior towards the child victim also shows his intent, his sexual interest in children. What was that? Well, for example, after he had set up the cameras, she's wearing sweatpants and an oversized hoodie. She's in the bedroom. He somehow calls her, because he knows that she's in the bedroom. And then she says, hey, go change into sexy clothes. So that shows what he, shows he's watching, and it shows what he wants to see. He wants to see her get naked so that she changes clothes. Moreover, you have the 404.14 evidence, which was properly noticed. The first one, questions one through 34, not the oral sex, but the first 34 questions, where it shows he, with a different stepdaughter, he talks to her about sex with her boyfriend. He then goes to her room, exposes himself. And this is going into mistrial issue. But it's not just that he exposes himself. He grabs her neck and pulls her towards him, thus hitting her in the face or place, you know, she says he places the genitals in her mouth. So this is not just an exposure. This is a physical, there's momentum there, which is moving towards the mistrial point. Why, while oral sex is different, it's not that different from the other evidence that was properly admitted in this case. I will say, I want to talk a little bit about Judge Leibowitz's questions, because I have to say, I had some of the same thoughts, which are, you know, normally, in just a regular case, a witness comes on the stand, and they give their testimony, and then they say something different than they said earlier. That generally is what we call cross-examination. And generally what happens is the opposite attorney, whether it's a government attorney for a defense witness, a defense cross-examining if it's a government witness, would come in and say, didn't you meet with the prosecutor on this date? Yes, I did. And didn't you tell the prosecutor something different than that? Well, yes, I did. And now you're saying something different, right? Why did you lie? Why did you change your story? What did you do before? I mean, those are the things cross-examination is made of. Why was that not how this was handled, as opposed to this sort of, like, I'm going to cut it off, I'm going to exclude it, and then no examination going forward, and then dealing with it at mistrial? I'm just confused by all of that. Well, so I can't get into the head of the district judge, but I imagine that, based on the record, I believe defense counsel did not want to highlight the oral sex. That was very important. And that's why the defense counsel requested, or agreed to four times, just tell the jury to disregard. Just tell the jury to disregard. And it was- I will say, in a matter of preservation, I mean, defense counsel was clear. Judge, I don't think any instruction could unring this bell. I don't think anything could undo it. But yes, when it came time to instruct, because I think the district judge rightly said, I need to tell the jury something, the counsel said, I don't want you to re-highlight the testimony, so just say the last thing that's said, disregard it, right? Yes. Right. And I think there was some discussion outside the jury's presence about cross-examination, but defense counsel did not seem to want to go that route. Defense counsel wanted the mistrial, which, again, was not appropriate, especially in the fact that the properly noticed. All of this other evidence that properly came in wasn't that different. It just seems, I don't know that I've ever seen the posture of, let's take a cooperating witness. A cooperating witness testifies. There's all sorts of reports about what the cooperating witness said previously. There's grand jury testimony. Defense counsel has all that, either pursuant to Jenks or pursuant to Brady obligations or whatever it is. And the cooperator now testifies to something, as I think Judge Leibowitz said, one sentence different than what was said earlier. No one says mistrial, get rid of the case. What they say is, okay, feel free, you have open season to be able to talk about those inconsistencies. Right. And that certainly would have been proper here. The district court decided to strike the question 35, strike the response to question 35, and move on. And I mean, this court has recognized the point that you're making. In Delgado, this court recognized that it's common for witnesses to make these potentially prejudicial remarks and that any prejudice is cured by an accurative instruction from the bench, which is what happened here. Right. And if the government knew about it, then this would be a Giglio or Brady issue. Right. There's a way to handle that. Correct. But that's not what happened here. We all agree. No one is saying that happens. So I guess I'm just confused by the posture of all of this. And I think that's, I'm not going to speak for Judge Leibowitz, but I suspect what's animating some of his questions and some of my own for why we're here as opposed to just, why don't we just examine the witness and feel free to impeach her on the prior inconsistent statement. Right. And like I said, that would have been a perfectly proper way to proceed. It's just, I mean, I can't speak to that since that's not what we have here. Is the government aware, because I couldn't find any, and I'll ask the same to your adversary when he gets up. I think what all of this goes to is there comes a point on, let's take a standard 404B case. 414, frankly, makes it very easy for the government in many respects because Congress decided that it should be easier for the government. But on a straight 404B, I couldn't find a case where they say, well, the notice was detailed and this went so far outside of the subject matter of what was noticed that we're just done. I have not found that case. In fact, what you're saying, counsel, is my search wasn't so bad because it is common that even in straight 404B cases where 19 things are listed by the government, there's a 16A that comes out of the witness that is never specifically itemized. So I'm just asking the United States, and I'm going to ask your adversary, is there any case that says what I just said, that, you know, you did one through 19, but 20, we're just done. There is no curative instruction. That's what I think Judge Luck and I are asking in different ways. I see. Now, I have not encountered that case, and I've done a lot of research in this case. I can't find it either in the Eleventh Circuit. Thank you, counsel. Yes. Unless there are other questions from the panel, we just ask that the Court affirm the judgment and sentence in this case. Thank you. Very well. All right. Mr. Kent, you've got some rebuttal time. Thank you, Your Honors. Judge Leibowitz, isn't my Carrasco case the case . . . Well, tell me why you think Carrasco fits that hypothetical. There's a 404B notice in Carrasco, it's a drug case, but the testimony at trial is not just what was in the 404B, but some way much additional . . . Yes. What was the additional in Carrasco? More drugs. Yep. More drugs. And what else? I mean, Carrasco . . . that's a fair point to rejoin. Carrasco . . . And reversed. Carrasco is the best case for you to stand for the proposition that there comes a point where outside of what is noticed, we're just done. Your Honor, can I suggest why there are not more such good cases? Because this is an obvious mistrial. I mean, to me, part of why I thought we were getting this oral argument would be, why did the judge not simply declare a mistrial, for heaven's sakes? And the answer to the last hypothetical question, too, the problem is why it didn't just go on into segue into cross-examination is because it's not admissible evidence. The judge would have been reversed. That would have been an invited error to say, you know, let's go ahead. I know they didn't notice it. I know it's not admissible under 404.414, but let's have at it and I'll just cross-examine. There seems to be a few differences, though, with Carrasco that seem to be relevant, counsel, given that we're relying on it so heavily. First is that, unlike there, here, there's no dispute about what happened in Puerto Rico. And this case isn't about what happened in Puerto Rico. The defense here simply is that he was not recording his stepdaughter, that that was not what he was doing. He was not recording her. And he certainly had no—it was a technical defense that, to the extent they were recording, these were not images that fell within the statute. That was the defense. Judge, I think the defense simply was the JOA argument. Right. This does—it's legally insufficient. But that has nothing to do with what happened in Puerto Rico. Well, but that just shows why—how weak the government's case was. It really—the JOA, in our opinion, should have been granted. I'm not sure it does show that, but my—the argument—the point is, in Carrasco, what we said is that the 404B evidence, quote, went to the heart of the defendant's defense. This here is the 404B, 414 evidence, did not go to the heart of the defense, which was a technical defense that it—as you said, the JOA argument, it just simply didn't meet the elements of the statute. I would agree. This 404 doesn't go to the heart of the— That's one big difference with Carrasco. Let me— Another— Let me ask you about another one. There, what the defendant there did, which is not what happened here, said, I would like to rebut the testimony, the surprise testimony. I'd like an opportunity to be able to rebut this. And the court shut it down and said, that's going to be a sideshow, so no. Here what the court did is give a top-line instruction, a bottom instruction, an instruction to disregard, and then an instruction to the jury afterwards about what to do. That seems to—and you specifically did not want to—did not want to cross-examine on this, not you, your client. No, but let me say another thing that's different, which is in my favor, is there wasn't even a motion for mistrawal in Carrasco, and yet the Eleventh Circuit reversed without a motion for mistrawal. Counsel, counsel, let's focus on what I'm talking about, which is, you agree that, that counsel did not even seek to cross-examination, to cross-examine.  The counsel did not invite the error. That's what I would agree on. So there's also a third thing that seems to be pretty different, and that is there the United States conceded that the evidence was not overwhelming in that case. Well, I don't concede the evidence is overwhelming in this case. You don't, but they, the government certainly thinks it is overwhelming, and we can go through some of the evidence, but that seems to be another big difference between Carrasco and this case. Carrasco, your Honor, may I address before my time runs out, though, about the focusing of the camera? You do what you want, but I, counsel, I, you brought up Carrasco, and I, I just want to be able to understand why it does or does not bind us in this case. Well, binding, that's, that's not exactly the word to use. It's a, it's a case that would indicate how this court should rule, the courts, the court has before, reversed under similar circumstances. No cases are identical. This is not identical, but it shows that, to answer Judge Leibowitz's question, yes, the Eleventh Circuit has reversed under similar circumstances. Let me do this, counsel. I mean, let's say we, we agree with you. Thank you. All the government would have to do in the future to satisfy the law, and I'd like to know whether you agree with this or not. Just give us a fair trial. No, no, sir, is, is drop a footnote in every single 404 and 414 notice and say, this is the best evidence that the government has from this live witness based on two interviews at this time. And at that point, your client would be on notice, and it would be up to them. And then we would know for sure that if they don't ask for a hearing in advance of trial to pad out her testimony, the government would be covered, right? It's the failure, in your view, to have some sort of caveat that is the real flaw here, right? No, the failure is the government did not comply with the law. The law is clear. The rule is clear. This is not an ambiguous rule. It's not an unclear rule. The rule is clear. Notice is required 15 days before trial to give the defendant a fair trial. This isn't state court. I don't have a right to do depositions. I don't have a right to an evidentiary hearing here. I don't have a right to any discovery about this witness. Thanks counsel. Judge, may I address the focusing of the camera just a moment? Yeah, I'll give you a minute. I would again. I'd encourage the court to look at the videos. The camera moved. Judge, look, the camera moved away from the child. It didn't move to the child. The only time in these three exhibits that the camera moved, it moved away from the child. It seemed to me it's some kind of a motion sensor camera that something caused it to shift away. That's all. There was no focusing on the cameras just fixed there. It's just fixed in one view. One time in one of the clips, it moves away from the child and it moves back. That's all it did. That's the only quote focusing or movement of the camera in these exhibits. I take issue with the government bringing up facts not in the record. I think there was no forensic examination of the phone testimony in the record to show us what was found in the phone. What else was there? How many other files were there? How many innocent pictures were there? For all I know, the government cherry-picked the only three images of the child undressing out of a hundred. We don't know. That's not in the record. I object to the counsel arguing facts not in the record. Thank you. Okay. Very well. This is submitted. We'll move to the third and final case of the day.